**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

JANE DOE,

Plaintiff,

v.

WYNDHAM HOTELS AND RESORTS, INC.; PALACE INN FRANCHISING, LLC; SITAPARSO, INC.; VALI, LLC; HD 1960 CORP.; AVISH HOSPITALITY, LLC; JAI BHAGAVAN, INC.

Defendants.

**JURY TRIAL DEMANDED**
Pursuant to Fed. R. Civ. P. 38

# PLAINTIFF'S ORIGINAL COMPLAINT

## INTRODUCTION

1. In early 2023, Plaintiff Jane Doe had just celebrated her seventeenth birthday. But instead of attending her high school, or otherwise enjoying the life of a typical teenager, she spent her days and nights at a series of hotels in Houston, Texas, being sold for sex by a mother-son duo of traffickers. One of her traffickers is currently serving a twenty-year sentence for trafficking Plaintiff and several other young women. Plaintiff now files this civil action to recover from the hotels that profited from her trafficking, while she was a minor, from around September 2023 to November 2023.

2. Houston is home to one of the largest and well-known sex-trafficking markets in the United States. A roughly one-mile stretch of Bissonnet Street—commonly known as the

"Blade," or the "Track"—is notorious for prostitution, and the very place where sex trafficking victims, such as Plaintiff, are forced to work. Another well-known area is the FM 1960 corridor.

3. Defendants owned and operated hotels—each located either on the Blade or the FM 1960 corridor—including the Palace Inn, Days Inn, Camelot Inn, and Hotel Royale, where Plaintiff was sold for sex by her traffickers.

4. Plaintiff's participation was anything but voluntary. She was deceived, coerced, drugged, violently beaten, and threatened, ultimately forcing her to engage in commercial sex acts—often more than ten times per day. And even though Defendants observed Plaintiff, a minor, engaged in commercial sex acts at their hotels, and even though Defendants knew or should have known she was being trafficked, they chose instead to turn their heads and reap the profits at Plaintiff's expense.

5. Plaintiff was a child—away from home and terrified. No amount of makeup, long hair, or lustful clothing could hide her youthful baby face.

6. It is no exaggeration to say that sex trafficking is modern-day slavery. Traffickers, also referred to as "pimps," coerce victims to engage in commercial sex acts. They often use a combination of deceit, forced drug dependency, along with a trifecta of sexual, physical, and psychological abuse to control their victims in order to profit from their exploitation.

7. Traffickers depend on the hospitality industry. That's why hotels are the most common setting in which sex trafficking occurs. Many hotels, like the Defendants to this action, ignore the well-known signs of sex trafficking, allowing them to sell more rooms, and generate more income. These hotels provide privacy, anonymity, and easy access for sex buyers, all the while furnishing traffickers with a prime location and free reign to operate their illicit, lucrative schemes at the expense of young victims, such as Plaintiff.

8. Defendants and their employees, including but not limited to, front desk staff, housekeeping, and management, frequently turned a blind eye to the trafficking of Plaintiff and other victims. They knew or should have known of the rampant sex trafficking occurring on their properties.

9. Sex trafficking is a federal crime under the Trafficking Victims Protection Reauthorization Act ("TVPRA"). In addition, to combat the scourge of sex trafficking in the United States, Congress provided a means of relief for trafficking victims against those who knowingly benefit from participation in a venture, which that person knew or should have known has engaged in sex trafficking. 18 U.S.C. § 1595(a).

10. Defendants knew or should have known that each of their ventures—the Palace Inn, Days Inn, Camelot Inn, and Hotel Royale Ventures—acted in violation of the TVPRA. Accordingly, because Defendants knowingly benefitted from participation in these Ventures under the TVPRA, they are liable to Plaintiff Jane Doe under the same.

## JURISDICTION & VENUE

11. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiff asserts claims arising under federal statute, 18 U.S.C. § 1595(a).

12. Defendants are subject to the personal jurisdiction of this Court because the Defendants are either residents of the state of Texas, or in the alternative, have purposefully availed themselves of the market in this forum such that they have substantial contacts with the state of Texas, and they can reasonably expect to be hailed into court in this state.

13. Venue is laid properly in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims asserted in this action occurred in the judicial district where this action is brought.

## THE PARTIES

14. Plaintiff Jane Doe ("Plaintiff"), proceeding under pseudonym, is a natural person who is currently a resident and citizen of the state of Texas. [1]

15. As a result of the control, force, fraud, and coercion exerted over her, Plaintiff was incapable of managing the ordinary affairs of her life during the period she was being trafficked.

16. Avish Hospitality, LLC ("Avish" and "Days Inn Defendant") is a for-profit limited liability company organized under and existing pursuant to the laws of Texas, with its principal place of business located in Houston, Texas. Avish presently owns and operates the Days Inn and Suites by Wyndham (the "Days Inn"), a budget hotel located at 410 FM 1960 Houston, TX 77073, and owned and operated that hotel throughout the time Plaintiff was trafficked there.

17. Avish regularly conducts business in the state of Texas, derives substantial revenue from services rendered in Texas, and has committed tortious acts or omissions within Texas, resulting in injuries to Plaintiff within the state of Texas. It may be served with process through its registered agent: Maya Patel, 410 FM 1960 Houston, TX 77073.

18. Wyndham Hotels & Resorts, Inc. ("Wyndham") is a Delaware corporation with its principal place of business located at 22 Sylvan Way, Parsippany, New Jersey 07054. Wyndham is one of the largest hotel franchises worldwide, with twenty brands, and nearly 9,000 branded properties spanning more than eighty countries.

19. Wyndham and its wholly owned subsidiaries, including Wyndham Hotels and Resorts, LLC ("WHR") and Wyndham Hotel Group, LLC ("WHG"), regularly conduct business

[1] Due to the sensitive, private, and potentially retaliatory nature of these allegations, this complaint identifies Jane Doe by pseudonym name only. Jane Doe will move the Court to proceed under pseudonym in all filings, all public court proceedings, and to limit the disclosure of information about Jane Doe's true identity in order to protect Jane Doe.

in the state of Texas, derive substantial revenue from services rendered in Texas, and have committed tortious acts or omissions both within and outside the State of Texas, which have resulted in injuries to Plaintiff in Texas. Wyndham may be served with process through its registered agent: Corporate Creations Network, Inc., 2595 N. Dallas Pkwy, Suite 350, Frisco, TX 75034.

20. Days Inn Worldwide, Inc. ("Days Inn Corp.") is a Delaware corporation with its principal place of business located at 22 Sylvan Way, Parsippany, New Jersey 07054. Days Inn Corp. regularly conducts business in the state of Texas, derives substantial revenue from services rendered in Texas, and has committed tortious acts or omissions both within and outside the state of Texas, which have resulted in injuries to Plaintiff in Texas. Days Inn Corp. may be served with process through its registered agent: Corporate Creations Network, Inc., 2595 N. Dallas Pkwy, Suite 350, Frisco, TX 75034.

21. Days Inn Corp. is a wholly owned subsidiary of Wyndham by and through Wyndham's subsidiaries WHR and WHG (Wyndham and Days Inn Corp. are herein referred to as the "Wyndham Defendants").

22. The Wyndham Defendants are the franchisor of the Days Inn and Suites by Wyndham hotel located at 410 FM 1960 Houston, TX 77073. Its relationship with Avish is governed by both contract and its course of conduct regarding operation of the Days Inn.

23. Wyndham, by and through its wholly owned subsidiary, Days Inn Corp., ultimately exercised control over the day-to-day operations at the Days Inn owned by Avish, by exerting such a high degree of authority that, functionally, Wyndham directed its operation.

24. VALI, LLC ("Vali" or "Palace Inn Defendant") is a for-profit Texas limited liability company with its principal place of business located in Pearland, TX. Vali owns and operates the

Palace Inn hotel located at 8200 Southwest Fwy #40 Houston, TX 77036 (the “Palace Inn”), and owned and operated that hotel throughout the time Plaintiff was trafficked there. It regularly conducts business in the state of Texas, derives substantial revenue from services rendered in Texas, and has committed tortious acts or omissions within the state of Texas, resulting in injuries to Plaintiff in Texas. It may be served with process through its registered agent: Raj Das, 1855 N. Main St. Pearland, TX 77581.

25. Palace Inn Franchising, LLC (“Palace Inn Franchising”)s a for-profit Texas company with its principal place of business located in Houston, TX. Palace Inn Franchising charters fifty Palace Inn locations across the state of Texas alone. It regularly conducts business within the state of Texas, derives substantial revenue from services rendered in Texas, and has committed tortious acts or omissions within Texas, which have resulted in injuries, including those to Plaintiff, within the state of Texas. Palace Inn Franchising may be served with process through its registered agent: Republic Registered Agent, LLC, 17350 State Hwy 249, Suite 220, Houston, TX 77064.

26. Palace Inn Franchising is the franchisor of the Palace Inn Hotel located at 8200 Southwest Fwy #40, Houston, TX 77036. Its relationship with Vali is governed by both contract and its course of conduct regarding operations of the Palace Inn hotel.

27. Palace Inn Franchising ultimately exercised control over the day-to-day operations at the Palace Inn owned by Vali, by exerting such a high degree of authority that, functionally, Palace Inn Franchising directed its operation.

28. HD 1960 Corp. (“HD 1960” or the “Camelot Inn Defendant”) is a for-profit Texas corporation with its principal place of business located in Houston, TX. It owns and operates the Camelot Inn & Suites located at 1425 FM 1960 Road West #34, Houston, TX 770909 (the

"Camelot Inn"), and owned and operated that hotel while Plaintiff was trafficked there. HD 1960 regularly conducts business in the state of Texas, derives substantial revenue from services rendered in Texas, and has committed tortious acts or omissions within Texas, resulting in injuries, including those to Plaintiff, within the state of Texas. HD 1960 may be served with process through its registered agent: Hasmukh Vasan, 1425 FM 1960 Road West, Houston, TX 77090-3303.

29. Jai Bhagavan, Inc. ("Jai Bhagavan" or the "Hotel Royale Defendant") is a for-profit Texas corporation with its principal place of business located in Houston, TX. It owned and operated the Hotel Royale located at 250 FM 1960 Road East, #40, Houston, TX 77073 (the "Hotel Royale"), while Plaintiff was trafficking there. Jai Bhagavan regularly conducted business in the state of Texas, derived substantial revenue from services rendered in Texas, and has committed tortious acts or omissions within Texas, resulting in injuries, including those to Plaintiff, within the state of Texas. Jai Bhagavan may be served with process through its registered agent: Mahesh V. Patel, 3510 Telephone Rd., Houston, TX 77023.

## FACTUAL ALLEGATIONS

### I. SEX TRAFFICKING

30. Most individuals involved in prostitution are victims of sex trafficking.[2]

31. Sex trafficking is the use of force, fraud, or coercion to recruit, harbor, transport, or obtain persons for the purpose of inducing them to engage in a commercial sex act.[3]

---

[2] *See, e.g.*, A National Overview of Prostitution and Sex Trafficking Demand Reduction Effects, Final Report, https://www.ojp.gov/pdffiles1/nij/grants/238796.pdf (last visited July 15, 2026); Prostitution and Trafficking in Women: An Intimate Relationship, https://www.ojp.gov/ncjrs/virtual-library/abstracts/prostitution-and-trafficking-women-intimaterelationship (last visited July 15, 2026).

[3] https://humantraffickinghotline.org/en/type-trafficking/human-trafficking

32. Sex trafficking is violent. Victims are locked up, drugged, beaten, terrorized, and raped repeatedly. This continual abuse, along with financial, psychological, and emotional manipulation, enables traffickers to maintain control over their victims. Victims are methodically "broken" and controlled by their traffickers through coercive trauma bonding, among other techniques, resulting in an inability of the victim to act independently of their trafficker(s). This includes failing to take advantage of potential opportunities to escape.

## II. HOUSTON'S WELL-KNOWN REPUTATION AS A TRAFFICKING HUB.

33. Houston is widely recognized by local and federal law enforcement agencies, research organizations, and anti-trafficking advocates as one of the largest sex trafficking hubs in the United States.[4]

34. And within the city of Houston itself, certain areas are known hotspots. The area most notorious for prostitution and sex trafficking activity is the Bissonnet corridor located in Southwest Houston. The Bissonnet corridor is an approximately one-mile segment of Bissonnet Street between the Southwest Freeway and the Sam Houston Tollway. This corridor is commonly referred to as the "Blade" or the "Track."[5]

35. Another well-known area in Houston is the FM 1960 corridor, located in northern Harris County. This area has been specifically identified by law enforcement as a significant problem zone for prostitution and sex trafficking activity. Numerous police raids and sting operations have been conducted there in response.[6]

---

[4] *See*, *e.g.*, https://www.houstontx.gov/council/committees/pshs/20220120/hpd-human-trafficking.pdf; https://elijahrising.org/human-trafficking-statistics/

[5] https://abc13.com/post/no-more-hourly-rates-for-alleged-hotsheet-hotel/1484300

[6] *See*, *e.g.*, https://www.fox26houston.com/news/13-arrested-prostitution-operation-harris-county-fm-1960; https://www.khou.com/article/news/crime/mugshots-44-arrested-in-north-houston-prostitution-sting/285-482951782; https://www.fox26houston.com/news/sex-trafficked-women-rescued-and-several-people-arrested-in-nw-harris-county-prostitution-sting.amp; https://abc13.com/post/dozens-

36. All the hotels, which Defendants operate, and at which Plaintiff was trafficked, are located in one of these two areas.

**III. HOTELS ARE CRITICAL TO THE TRAFFICKING INDUSTRY**

**A. The Role of Hotels.**

37. Without hotels, where illicit sexual encounters are removed from the streets and tucked away behind hotel-room-walls, the sex trafficking industry would be significantly disrupted. This obvious fact has been noted by several experts and by justices of the United States Supreme Court. In 2015, Justice Antonin Scalia, joined in dissent by Chief Justice John Roberts and Justice Clarence Thomas, noted that:

> "Motels… are also a particularly attractive site for criminal activity ranging from drug dealing and prostitution to human trafficking. Offering privacy and anonymity on the cheap, they have been employed as… rendezvous sites where child sex workers meet their clients on threat of violence from their procurers."

*City of Los Angeles v. Patel*, 135 S. Ct. 2443, 2457 (2015).

38. Out of calls made to the National Human Trafficking Hotline involving hotels and motels, ninety-two percent reported sex trafficking, with another two percent making reports of a combination of sex and labor trafficking.[7] One 2012 study revealed that 63 percent of trafficking incidents occurred in hotels.[8] And a survey conducted by the Polaris Project revealed that "75% of [trafficking] survivors responding to [Polaris's] survey reported coming into contact with hotels at

---

arrested-in-north-houston-prostitution-sting/2524843/; https://abc7chicago.com/post/undercover-operation-yields-11-prostitution-arrests/735932/; https://abc7ny.com/archive/8844875/

[7] *Human Trafficking and the Hotel Industry*, Polaris Project, https://polarisproject.org/sites/default/files/human-trafficking-hotel-industry-recommendations.pdf (last visited July 15, 2026).

[8] Jon Conte, *et al.*, *Inhospitable to Human Trafficking Program Evaluation*, at 2, Businesses Ending Slavery and Trafficking, (July 2014), https://www.bestalliance.org/uploads/5/0/0/4/50047795/itt_program_evaluation.11_without_appendix.pdf at 5 (last visited July 14, 2026).

some point during their exploitation… Unfortunately, 94% also disclosed that they never received any assistance, concern, or identification from hotel staff."[9]

39. Attorneys on behalf of the hotel industry have estimated and reported to industry representatives that eight out of ten human trafficking arrests occur in or around hotels.[10]

40. Several hotels in Houston, including Defendants' hotels, accommodate and facilitate the sex trafficking of women, men, and children. Victims, including Plaintiff, were and are rotated through these hotels in a vicious cycle of exploitation, sometimes staying at one hotel for weeks or months.

41. A significant percentage of the revenue generated from Houston's sex trafficking economy is funneled directly to hotels via the daily or hourly rental of the rooms need to harbor, exploit, and sell victims, including Plaintiff.

**B. The presence of sex trafficking and measures available to prevent it have been known in the hotel industry for decades.**

42. Plaintiff's victimization followed a pattern that was readily observable and should have been obvious to hotel employees based on information available to the public at large and to the hotel industry in particular.

43. In 2010, the Department of Homeland Security ("DHS") issued guidance to hotel companies identifying warning signs of sex trafficking at hotels. The Defendants knew or should have known of this guidance.

---

[9] *Hotels and Motels Recommendations*, The Polaris Project, https://polarisproject.org/hotels-motels-recommendations (last visited July 15, 2026).

[10] Rich Keating, *Human Trafficking: What Is It and How It Impacts the Hospitality Industry*, Presentation Delivered at AHIA Sprint Conference 2013, Washington, D.C., http://www.ahiattorneys.org/aws/AHIA/asset_manager/get_file/92983 at 6 (last visited July 15, 2026).

44. According to DHS, hotel staff should be vigilant in observing signs of human trafficking including but not limited to, signs of poor physical appearance (injury, illness, poor hygiene, sleep deprivation, malnourishment), constant monitoring by others, requests to housekeeping for linens and towels without entry into the room,and the presence of multiple computers or cell phones.[11]

45. Additional well-known signs of sex trafficking include:

a. individuals that exhibit signs of fear, anxiety, tension, submissiveness, and/or nervousness;

b. individuals that avoid eye contact and interaction with others; and

c. the presence of a large number of condoms.[12]

46. Most or all of which were signs exhibited by Plaintiff each time she was exploited on the Defendants' premises.

47. Furthermore, the Defendants knew or should have known of the ECPAT-USA and the Code.

48. The Code, first written in 1998, has been signed by several well-known enterprises within the hospitality and tourism industry, including Carlson Companies in 2004, Wyndham, Hilton, and Delta in 2011, and by Sabre Holdings in 2012.

---

[11] U.S. Dep't of Homeland Security, *Human Trafficking and the Hospitality Industry*, https://www.dhs.gov/blue-campaign/hospitalityindustry (last visited July 15, 2026).

[12] *Id.*; *see also* Love 146, Red Flags for Hotel & Motel Employees, https://love146.org/wp-content/uploads/2017/04/Hospitality-Red-Flag-and-ReportingLove146.pdf (last visited July 14, 2026); Texas Attorney General, Human Trafficking Red Flags, https://www2.texasattorneygeneral.gov/files/human_trafficking/human_trafficking_red_flags_handout.pdf (last visited July 14, 2026).

49. As early as 2011, ECPAT-USA has partnered with hospitality brands to co-develop training modules for hotel employees which aim to help them recognize indicators of human trafficking, including the commercial sexual exploitation of children.

50. ECPAT-USA has also published a number of indicator guides, to further aid hospitality and tourism entities identify and combat human trafficking. Those indicators include:

a. paying for rooms using cash or pre-paid gift cards;

b. paying for multi-day stays one day at a time;

c. requesting isolated rooms or rooms nearby an exit;

d. wearing the same attire, or attire that is revealing or inappropriate for weather conditions; and

e. possessing few personal belongings.

51. For years, members of the hotel industry have been repeatedly warned not to turn a blind eye to sex trafficking. For example, at a 2013 hotel industry presentation, representatives for the industry were informed, among other things, to "Make sure hotel not complicit," 'Manager not looking the other way," and "No pay off for silence of lack of curiosity."[13]

**C. City of Houston mandated sex trafficking training for all hotel staff.**

52. In recognizing the depth of the sex trafficking problem in Houston and the key role hotels play in facilitating sex trafficking, Houston became the first major U.S. city to pass an anti-trafficking ordinance, and in 2020 passed an ordinance requiring hotel and motel staff to receive human trafficking training.[14]

53. The ordinance requires all hotel operators to:

---

[13] Keating, *supra* n.10 at 19.

[14] https://www.thomsonreuters.com/content/dam/ewp-m/documents/thomsonreuters/en/thomson-reuters-institute/hotel-ordinance/hotel-ordinance-ara.pdf

a. train all operators, managers, and hotel employees on recognizing and reporting signs of sex trafficking;

b. post a sign in clear view of all employees listing indicators of trafficking and the phone numbers of local law enforcement and the National Human Trafficking Hotline to facilitate reporting; and

c. submit annual certifications to the City that all employees have received training in recognizing and reporting signs of sex trafficking.

54. Yet, despite these efforts, sex trafficking prevails in many Houston hotels, including those owned and operated by Defendants.

**D. Defendants chose to ignore obvious signs of sex trafficking.**

55. Defendants review hotel performance, room occupancy, and profitability like all businesses. Defendants know when revenue is down and seek, in industry parlance, to "put more heads in beds." Defendants also know when revenue is up and when that rise in revenue results from turning a blind eye to safety and security issues at their hotels, even when Defendants knew or should have known a portion of those profits were derived from sex trafficking.

56. The indicia of human trafficking and effective preventative measures are widely known and available to all in the hospitality industry, including Defendants who are required to provide training on the signs of sex trafficking. Defendants knew or should have known of these well-known signs of sex trafficking. Indeed, as ECPAT has concluded:

> "The hospitality industry is in a unique position to identify and report human trafficking due to its perceived anonymity. Traffickers believe they can go unnoticed while exploiting victims across the globe in hotels—ranging from budget properties to luxury resorts. From check-in to

check-out, there are a number of indicators victims and exploiters exhibit during the time they are on a hotel property."[15]

57. Accordingly, each of the Defendants had a responsibility to adopt, implement, and adequately enforce policies to avoid facilitating sex trafficking, and to train hotel staff to identify and respond to "red flags" of sex trafficking.

58. Despite knowing what signs to look for and which policies to implement to precent, identify, and deter sex trafficking in their hotels and to ensure they were not profiting from sex trafficking, Defendants failed to take those steps. Instead of protecting Plaintiff and the numerous other victims, Defendants chose to protect their pockets.

**IV. THE TRAFFICKING OF PLAINTIFF**

59. In or around September 2023, when Plaintiff was 17, her traffickers used false promises and psychological manipulation to lure her from home and convince her to live with her trafficker(s). What Plaintiff thought would be an opportunity to avoid stress at home, quickly took a dark turn.

60. Her trafficker(s) exerted control over her through physical violence, psychological manipulation, and drug use. They forced Plaintiff to participate in commercial sex for their financial benefit.

61. Her traffickers set a quote of at least $1,000 per night, that she was required to make and provide for them.

62. She was initially forced by her traffickers to solicit clients, also known as Johns, on the Blade. Plaintiff would engage in commercial sex acts (commonly referred to as "dates") with these men at hotels on or near the Blade, including the Camelot Inn, Days Inn, and Hotel Royale.

---

[15] ECPAT USA, *Training for Hotel Associates*, https://www.ecpatusa.org/hotel-training (last visited July 14, 2026).

63. Most often, however, Plaintiff's traffickers would solicit clients for her through online platforms.

64. Her traffickers placed online advertisements of her body on MegaPersonals, an online website. Clients would see those ads, respond to a number associated with a burner phone, and make arrangements with Plaintiff's traffickers to have sex with Plaintiff at Defendants' hotels.

65. Whether originating on the Blade or the internet, each of Plaintiff's encounters with a John was known as a date or a trick.

66. And while Plaintiff was handed money by the Johns she was required to see, she kept none of it. Her traffickers took it all.

67. Throughout her trafficking, Plaintiff endured mental, emotional, and physical abuse. She was repeatedly beaten, physically assaulted, and starved, especially when she attempted to flee her traffickers.

68. In one specific instance, Plaintiff was approached by a John as she hid behind a dumpster on the Blade. The John picked Plaintiff up and took her to the Palace Inn hotel where he brutally assaulted, raped, and recorded her, before paying her a large sum of money, and leaving. Plaintiff then gave the money to her trafficker who was waiting for her outside the hotel.

69. Plaintiff was physically injured before meeting with this John, and she walked through common areas of the Palace Inn hotel with the John before going into the room he had booked. Plaintiff's off-putting condition was visible. She was clearly scared, anxious, and walked with a limp due to a knee injury she received earlier that same day. The staff at Palace Inn observed Plaintiff in this condition and yet failed to follow protocols or otherwise intervene to stop Plaintiff's trafficking.

70. This instance was far from isolated. Plaintiff routinely had obvious physical injuries, including bruises. Other signs included her deteriorating physical condition that reflected malnourishment, poor hygiene, fatigue, and severe sleep deprivation. Plaintiff avoided making eye contact with other at Defendants' hotels, lacked control of any money or personal belongings, and was closely monitored by her trafficker.

71. Unsurprisingly, Plaintiff's horrific experience as a trafficking victim profoundly affected her physical and mental wellbeing, harm that continues to this day.

## V. TRAFFICKING AT THE DAYS INN

### A. Plaintiff was trafficked at the Days Inn.

72. The Days Inn is located along the FM 1960 corridor, an area notorious for prostitution and sex trafficking activity. Rooms at the Days could be rented for less than a 24-hour period or "by the hour."

73. The Days Inn Defendant knew or should have known from well before the time of Plaintiff's trafficking, that sex trafficking was occurring both on and around its property.

74. Plaintiff would go to the Days Inn with Johns who responded to online advertisements of her, posted by her trafficker. By using internet ads, her trafficker increased the number of "dates" she had daily. At the Days Inn in particular, it was common for Plaintiff to have upwards of twenty "dates" in a single day, each with a different man.

75. She was trafficked at the Days Inn along with other minors. Her trafficker housed multiple victims in a single hotel room.

76. Throughout the day and night, there was a steady stream of Johns coming to the Days Inn for dates with Plaintiff and the other girls trafficked alongside her.

77. While there, Plaintiff's trafficker forced her to meet a daily revenue quota. The ability to set up dates online, increased her quota, which meant more men she was forced to engage in commercial sex with at Defendant's hotel.

78. The staff observed Plaintiff's trafficker waiting outside the room or in the parking lot with a rotating cast of minors, while men came and went to the room throughout the day.

79. More generally, the staff at the Days Inn observed a larger stream of men coming, staying for a short period of time, and then leaving. They came not only for dates with Plaintiff and her trafficker's other victims, but for dates with victims of other traffickers also operating out of the Days Inn.

80. Plaintiff and the other victims being trafficked frequently requested additional towels and linens from hotel staff as a result of the number of men visiting each day.

81. Further, as a result of the volume of men, the trash can in Plaintiff's room, when emptied by hotel staff, was overflowing with used condoms.

82. During her stays at the Days Inn, Plaintiff observed multiple other sex trafficking victims.

83. The Days Inn Defendant knew or should have known that Plaintiff, a minor, was a trafficking victim and that it was obtaining revenue from her trafficking.

84. While at the Days Inn, Plaintiff exhibited physical injuries including visible bruising and black eyes from regular beatings by her trafficker.

85. Several employees at the Days Inn observed Plaintiff during her stays there. The Days Inn Defendant is responsible for the acts, omissions, and knowledge of its employees while they, within the scope of their employment, rented hotel rooms to her trafficker and cleaned and restocked hotel rooms evidencing a high volume of commercial sex activity.

86. The Days Inn Defendant facilitated the trafficking of Plaintiff and numerous other victims by, among other things:

a. inadequately hiring, training, and supervising its employees;

b. choosing not to report known or suspected criminal activity to law enforcement; and

c. implicitly and/or explicitly encouraging the activity of traffickers, including Plaintiff's traffickers, by creating an environment where trafficking could openly occur without the risk of interference or detection by law enforcement.

**B. Wyndham Defendants controlled the Days Inn operations.**

87. Upon information and belief, the Wyndham Defendants directly participated in and retained day-to-day control over renting rooms at the Days Inn by, among other things:

a. controlling all details of the guest reservation, check-in, and payment processes through management and control over all systems used for those processes and adoption of detailed and specific policies governing the means and methods used for each of these processes;

b. controlling and overseeing policies and procedures regarding check-in, payment, and identity verification procedures, including whether cash and prepaid cards could be used and who had to show identification;

c. requiring the franchisee to use the franchisor's centralized reservation system and franchisor's software for checking guests into rooms and preventing the franchisee from using any other systems;

d. requiring the franchisee to use a property-management system and data-management systems operated and controlled by the franchisor that ensured that data related to each room reservation was received and maintained in the franchisor's systems;

e. assuming sole ownership over all guest information; and

f. overseeing "do not rent" lists for the property.

**C. Wyndham Defendants knowledge of trafficking at its hotels.**

88. The Wyndham Defendants' actual knowledge of sex trafficking in the hotel industry included actual knowledge of open and widespread trafficking at its properties, which they possessed long before the time Plaintiff was trafficked at the Days Inn.

89. While the Wyndham Defendants have made public pledges to take necessary steps to prevent sex trafficking at their hotels, those pledges have not stopped the sex trafficking from occurring, nor ceased the significant financial benefit they are deriving from providing a space for the exploitation of victims like Plaintiff to take place.

90. Wyndham's public statements confirm that it knew sex trafficking was a problem at its hotels and that it retained control over the response of its branded hotels to sex trafficking.

91. Wyndham has recognized it has a "critical role in increasing awareness and prevention" of sex trafficking in its hotels.[16] It has publicly claimed to be taking steps to avoid facilitating sex trafficking in its hotels since at least 2011.[17] However, Wyndham has refused to publish reports to show its progress on the EPCAT goals to combat sex trafficking in hotels.[18]

92. Unfortunately, while Wyndham's statements reflect actual knowledge of the problem of sex trafficking, emails among company executives reflect a hesitance to commit to

---

[16] https://hotelsmag.com/news/wyndham-implements-anti-prostitution-training/.
[17] *Id.*
[18] https://thecode.my.salesforce-sites.com/apex/MemberProfilenew?id=0019000000GxgPrAAJ&year=2026

meaningful anti-trafficking measures and a desire to avoid negative publicity without any significant burden.[19]

93. Despite knowing, no later than 2011, that sex trafficking was taking place at its hotels, and publicly committing to take steps to stop it, as recently as 2020, Wyndham made the National Center on Sexual Exploitation's Dirty Dozen List of major contributors to sexual exploitation.[20]

94. Sex trafficking was prominent at Wyndham-branded properties, including Days Inn. Public information, including scores of news stories and online reviews, confirms both the widespread sex trafficking problem at Wyndham branded hotels and the Wyndham Defendants' knowledge and understanding of the problem.

95. Over the last two decades, Wyndham-branded properties have been mentioned in at least two hundred criminal trafficking cases filed by the federal government.[21]

96. Examples of press accounts of sex trafficking at just its Days Inn locations across the country, include, among others:

a. In July 2010, a man was arrested at a Days Inn in Metairie, LA on human trafficking charges and was accused of forcing North Carolina teens into prostitution.[22]

---

[19] https://journalism.berkeley.edu/projects/should-hotel-chains-be-held-liable-for-human-trafficking/ ("Scott McLester, Wyndham's former general counsel and chief compliance officer, wrote in an e-mail to the company's then C.E.O., Stephen Holmes, 'Even though we have been hesitant to commit to everything the Code was asking for, the issue is not going away and it's starting to impact commercial relationships.' McLester added that the organization's 'concern about being 'bullied' into signing the Code is outweighed by the relative harmlessness of the Code itself.'").

[20] https://endsexualexploitation.org/wyndham/

[21] https://journalism.berkeley.edu/projects/should-hotel-chains-be-held-liable-for-human-trafficking/

[22] Michelle Hunter, Man arrested in Metairie on human trafficking charges; accused of forcing North Carolina teens into prostitution, The Times-Picayune (July 20, 2010), https://www.nola.com/news/crime_police/man-arrested-in-metairie-on-human-trafficking-charges-accused-of-forcing-north-carolina-teens-into/article_c113df92- 9046-56a1-bc02-7c065f5a9435.html.

b. In June 2011, a woman was sentenced to 9 years in prison for the sex trafficking of two 14-year-old girls. The girls were forced to work at the Days Inn in Hartford, Connecticut.[23]

c. In February 2012, a man was arrested by FBI agents and members of the Human Trafficking Task Force on charges of sex trafficking of children for pimping out a 14-year-old girl who was rescued from a Days Inn in Florida.[24]

d. Three people were arrested in July 2014 in Fayetteville on human trafficking charges after holding a woman captive at a Days Inn.[25]

e. In July 2014, three people were arrested and accused of kidnapping and torturing a woman for human trafficking out of a Days Inn in Orange County, CA.[26]

f. In September 2014, two Nevada residents were arrested on sex trafficking charges. Officers set up surveillance at a Days Inn in Nashville and "it did not take long for officers to observe heavy foot traffic in and out of that hotel room consistent with a prostitution operation."[27]

g. In April 2015, a Philadelphia man was sentenced for sex trafficking minors. The man worked as a security guard at a Days Inn in Philadelphia and "provided protection and assistance to sex traffickers operating at the motel in exchange for a daily fee."[28]

---

[23] Woman Sentenced to More Than Nine Years in Prison for Sex Trafficking of Minors, Press Release, Dep't of Justice, East Hartford, Conn., (June 24, 2011),

[24] Alexandra Seltzer, Federal officials catch, arrest man alleged to have prostituted Jupiter girl, 14, The Palm Beach Post (Feb. 7, 2012), https://www.justice.gov/archives/opa/pr/east-hartford-conn-woman-sentenced-more-nine-years-prison-sex-trafficking-minors.https://www.palmbeachpost.com/story/news/crime/2012/02/08/federal-officials-catch-arrest-man/7283405007/.

[25] Three arrested on human trafficking charges in NC, Fox8 (July 2, 2014), https://myfox8.com/news/three-arrestedon-human-traffick.

[26] Jeanne Kuang, Three Accused of Kidnapping, Torturing Woman for Human Trafficking in Orange County, NBC Los Angeles (July 30, 2014), https://www.nbclosangeles.com/news/three-accused-of-brutally-kidnapping-torturing-woman-for-human-trafficking-in-orange-county/65718/.

[27] Las Vegas Man, Woman Jailed on Prostitution Charges, City of Franklin, TN (Sept. 5, 2014), https://www.franklintn.gov/Home/Components/News/News/2563/.

[28] Philadelphia Man Sentenced for Sex Trafficking Conspiracy, U.S. Attorney's Office (April 9, 2015), https://www.fbi.gov/contact-us/field-offices/philadelphia/news/press-releases/philadelphia-man-sentenced-for-sex-trafficking-conspiracy

h. In July 2015, after investigating possible prostitution at a Days Inn in Maryland, Frederick County sheriff's deputies charged a Hagerstown man with human trafficking after two teenage girls were forced into prostitution.[29]

i. In March 2016, a 22-year-old man was arrested in Georgia, and charged with pimping a person under 18 and sex trafficking, after holding a 16-year-old against her will at a Days Inn and forcing her to engage in sex in exchange for money.[30]

j. In August 2018, four men were arrested at another Georgia Days Inn for trafficking after a 15-year-old victim was able to call 911.[31]

97. In addition to public press accounts, the Wyndham Defendants learned of sex trafficking at its hotels through guest reviews that it monitored that repeatedly referenced prostitution and hookers at its hotels.

**D. Wyndham Defendants knew or should have known of sex trafficking at the Days Inn, including Plaintiff's trafficking.**

98. Upon information and belief, the Wyndham Defendants knew or should have known of the sex trafficking occurring at the Days Inn due to, among other things, their:

a. detailed regular inspections of the property;

b. its access to surveillance systems at the property;

c. internal investigations regarding the property;

d. employment of field agents to work with hotels on trafficking issues;

[29] Jeremy Arias, Hagerstown man charged with trafficking of two teenage girls, The Frederick News-Post (July 1, 2015), https://www.heraldmailmedia.com/story/news/local/2015/07/01/hagerstown-man-charged-with-trafficking-of-two-teenage-girls/45202521/.

[30] Dyana Bagby, Sandy Springs man arrested in Athens, Ga., for sex trafficking, RoughDraft atlanta (March 24, 2016), https://roughdraftatlanta.com/2016/03/24/sandy-springs-man-arrested-athens-ga-sex-trafficking/.

[31] https://eastcobbnews.com/tag/days-inn-delk-road-area/.

e. receipt of guest complaints;

f. monitoring of guest feedback through reviews and survey responses;

g. receipt of information from hotel staff; and

h. receipt of information from law enforcement.

99. Upon information and belief, the Wyndham Defendants rules and policies for the Days Inn required its staff and management to report suspected criminal activity, including sex trafficking, to the Wyndham Defendants.

100. Based upon the extensive trafficking occurring at the Days Inn, the Wyndham Defendants received, or should have received, numerous reports of sex trafficking at the Days Inn.

101. And based upon the reports it received of the Days Inn, and the observation of Days Inn management and employees of Plaintiff, the Wyndham Defendants knew or should have known of Plaintiff's trafficking.

102. The Wyndham Defendants are responsible for the acts, omission, and knowledge of all the employees involved in the operation of the Days Inn because those acts and omissions were committed in the scope and course of employment and because the Wyndham Defendants ratified that conduct.

103. The Wyndham Defendants further failed to properly hire, train, and supervise its own employees responsible for monitoring and overseeing the operation of the Days Inn, who both knew or should have known of the widespread trafficking and allowed it to continue.

## VI. TRAFFICKING AT THE PALACE INN

### A. Plaintiff was trafficked at the Palace Inn.

104. The Palace Inn is located just off the Blade, Houston's most notorious area for prostitution and sex trafficking. The hotel was one of the most sought-after locations for trafficking in the area. Its proximity to the Blade, practice of not requiring identification, and willingness to rent rooms for less than a 24-hour period, or “by the hour,” made it particularly attractive for trafficking activity. Indeed, the Palace Inn was so popular amongst traffickers, that it would sometimes sell out, forcing Johns to seek rooms at other nearby hotels.

105. The Palace Inn Defendant knew, well before Plaintiff's trafficking, that sex trafficking was occurring not only near its property, but also on its property.

106. Trafficking activity at the Palace Inn was open and obvious. The premises was routinely occupied by prostitutes, trafficking victims, and traffickers congregating outside guest rooms and throughout the parking lot. The solicitation of commercial sex was readily apparent, with nearly nude women wearing pasties, thongs, high heels, and little else while moving about the Palace Inn. In addition, individuals regularly engaged in sex acts, openly and notoriously, in the hotel’s parking lot.

107. One online review posted around the time of Plaintiff’s trafficking states: “if you’re looking for a cheap motel and some sexy fun this might be right up your alley... it’s supposed to be where a lot of the escorts hang out, not that I would know about that (looks nervously around) ... so that’s probably why they get a lot of hourly-and-then-some business, as well.”[32]

---

[32] https://www.yelp.com/map/palace-inn-blue-houston

108. Throughout her trafficking, Plaintiff frequented the Palace Inn routinely, often staying there for extended periods until her trafficker(s) moved their operation to other hotels in efforts to keep their trafficking activity from being detected.

109. For Plaintiff, she essentially lived in the hotel room located at the Palace Inn. Her trafficker would advertise her body online, to which Johns would respond, and come to the hotel to have sex with Plaintiff. Oftentimes there were several men coming to her hotel room in one night.

110. Plaintiff's extended stays at the hotel, coupled with the steady stream of male visitors entering the hotel and making their way to Plaintiff's room, should have been suspicious, if not obvious, to hotel staff. Yet, the staff continuously failed to request both Plaintiff's identification and the identification of the men who frequented her room. Employees at the Palace Inn nevertheless facilitated this activity by failing to intervene or take reasonable action to identify those involved.

111. Her trafficker would wait outside, then, after each date, Plaintiff's trafficker would return to collect the money she was paid. Before too long, the same thing would happen again—a cycle that repeated throughout the days and nights. Her trafficker(s) appeared at the Palace Inn multiple times each night she was there, and was known to, observed by, and interacted with the hotel staff.

112. After each visit, or after transferring to a different room, hotel staff restocked the room with towels and discarded used condoms left in the room. However, they did not change the bedding, which was often covered in bodily fluids from Plaintiff's prior dates. Each of these are well-known "red flags" for sex trafficking.

113. During her visits to the Palace Inn, Plaintiff often witnessed several other sex trafficking victims, some of whom she knew. Plaintiff observed that the sex trafficking at the hotel appeared to take place in a designated set of rooms.

114. The Palace Inn Defendant knew or should have known that Plaintiff was a trafficking victim, and that it was generating revenue from her exploitation.

115. The front desk, housekeeping, and other staff at the Palace Inn would consistently observe Plaintiff, her trafficker, and her trafficker's other victims during the many nights she frequented the hotel. The Palace Inn Defendant is responsible for the acts, omissions, and knowledge of its employees, while acting within the scope of their employment, including renting hotel rooms to Johns and traffickers and restocking and/or cleaning rooms that exhibited evidence of commercial sex activity.

116. While at the Palace Inn, Plaintiff exhibited physical warning signs including, among other things, visible bruising and obvious signs of weakness and/or malnourishment.

117. The Palace Inn Defendant facilitated the trafficking of Plaintiff and countless other victims by, among other things:

a. inadequately hiring, training, and/or supervising its employees;

b. choosing not to report known or suspected criminal activity to law enforcement; and

c. implicitly and/or explicitly encouraging the activity of traffickers, including Plaintiff's trafficker(s), by fostering an environment where trafficking could openly take place without risk of interception or detection by law enforcement.

**B. Palace Inn Franchising controlled the operations of the Palace Inn.**

118. Upon information and belief, Palace Inn Franchising directly participated in and managed the daily operations, including room rental, at the Palace Inn by, among other things:

a. controlling all logistics of guest reservations, check-ins, and payment processes through management and directive over all systems used for those procedures, and adoption of detailed and specific policies governing the means and methods used for each of said processes;

b. controlling and overseeing policies and procedures regarding check-in, payment, and identity verification procedures, including whether cash and prepaid cards were accepted forms of payment, and who was required to show identification;

c. requiring the franchisee to use the franchisor's centralized reservation system and franchisor's software for checking guests into rooms, and forbidding the franchisee from using alternative systems; and

d. requiring the franchisee to use property-management and data-management systems operated and controlled by the franchisor, which ensured that data related to each room reservation was received and maintained within the franchisor's record systems.

**C. Palace Inn Franchising knew or should have known of sex trafficking on its premises, including the trafficking of Plaintiff.**

119. Upon information and belief, Palace Inn Franchising knew or should have known of the sex trafficking occurring at the Palace Inn due by, among other things, its:

a. detailed regular inspections of the property;

b. its access to surveillance systems on the property;

c. receipt of guest complaints;

d. monitoring of guest feedback;

e. receipt of information from hotel staff; and

f. receipt of information from law enforcement.

120. Upon information and belief, Palace Inn Franchising's rules and policies for the Palace Inn required its staff and management to report suspected criminal activity, including sex trafficking, to Palace Inn Franchising.

121. Based upon the extensive trafficking which occurred, and continues to occur at the Palace Inn, Palace Inn Franchising received, or should have received, numerous reports of sex trafficking at the Palace Inn hotel.

122. And based upon the reports it received concerning the Palace Inn, and careful observation of Palace Inn management and staff, Plaintiff's trafficker(s), and Plaintiff herself, Palace Inn Franchising knew or should have known of Plaintiff's trafficking.

123. Palace Inn Franchising is responsible for the acts, omissions, and knowledge of all the employees involved in the operation of the Palace Inn because those acts and omissions were committed in the scope and course of employment, and because Palace Inn Franchising ratified such conduct.

124. Palace Inn Franchising failed to properly hire, train, and supervise its employees responsible for the monitoring and oversight of the Palace Inn operations, whose knowledge of, or deliberate disregard for, the widespread sex trafficking occurring at the hotel allowed the illicit activity to continue unabated.

**VII. TRAFFICKING AT THE CAMELOT INN**

125. The Camelot Inn is also located along the FM 1960 corridor. Plaintiff often stayed at the Camelot Inn for several weeks at a time, where she was constantly trafficked.

126. The Camelot Inn Defendant knew or should have known, long before Plaintiff's trafficking, that sex trafficking was occurring both on and around its property.

127. The Camelot Inn is one of the hotels where Johns would meet with Plaintiff after responding to online advertisements of her, posted on MegaPersonals by her trafficker.

128. Throughout the time Plaintiff was trafficked at the Camelot Inn, her trafficker used revenue generated from her exploitation to pay "rent" for the hotel room. The room was reserved for three days to one week at a time, which would be extended several times as Plaintiff outstayed the original reservation. During this process, Plaintiff was never asked for identification.

129. She was trafficked at the Camelot Inn alongside other minors. Her trafficker housed multiple victims in a single room at the hotel, with stays lasting as long as two or three months.

130. By the time Plaintiff involuntarily arrived at the Camelot Inn, her trafficker(s) has well-established the ability to solicit tricks online, resulting in an immense number of dates—up to eighty—per day, with some staying for as few as ten minutes.

131. While there, Plaintiff's trafficker forced her to meet a daily revenue quota and forced her to engage in multiple dates with men per day.

132. When a John arrived for a date with Plaintiff or one of the other minors being trafficked with Plaintiff, the other girls would go into the hotel lobby until the John(s) concluded with the other victim.

133. The staff observed Plaintiff, and the many Johns meeting with her, coming and going from the hotel lobby several times per day. The hotel staff never offered her assistance and continued to rent to her trafficker. Plaintiff and the other victims were also observed by the hotel employees when their trafficker, on occasion, permitted them to get food at nearby fast-food restaurants.

134. More generally, the staff at the Camelot Inn observed a significant stream of men coming, staying for a short period of time, and then leaving. They came not only for dates with Plaintiff and her trafficker's other victims, but for dates with victims of other traffickers who also operated out of the Camelot Inn.

135. Plaintiff and/or the other victims being trafficked from the same room frequently requested additional towels and linens from hotel staff—so frequently that housekeeping staff knew some of the minor victims by name. Each day housekeeping staff removed trash bags overflowing with condoms and sometimes bloody items, that were fully visible through the clear trash can liners.

136. During her stays at the Camelot Inn, Plaintiff observed several other sex trafficking victims.

137. At one point during her stay(s) at the Camelot Inn, a trick held two of the other trafficking victims at gun point and tried to rob them. Instead of alerting authorities to the commotion, the Camelot Inn staff allowed Plaintiff's trafficker to avoid law enforcement, letting him usher Plaintiff and the other girls to another nearby hotel.

138. The Camelot Inn Defendant knew or should have known that Plaintiff was a trafficking victim and that it was generating revenue from her exploitation.

139. Several employees at the Camelot Inn observed Plaintiff during her stay(s) there. The Camelot Inn Defendant is responsible for the acts, omissions, and knowledge of its employees while they, during the course and scope of their employment, rented hotel rooms to her trafficker, and serviced hotel rooms that evidenced a high volume of commercial sex activity.

140. The Camelot Inn Defendant facilitated the trafficking of Plaintiff and numerous other victims by, among other things:

a. inadequately hiring, training, and supervising its employees;

b. choosing not to report known or suspected criminal activity to law enforcement; and

c. implicitly and/or explicitly encouraging the activity of traffickers, including Plaintiff's trafficker, by creating an environment where trafficking could openly occur without risk of interference or detection by law enforcement.

**VIII. TRAFFICKING AT THE HOTEL ROYALE**

141. The Hotel Royale is located along the FM 1960 corridor, less than a quarter mile from where the Days Inn, at which Plaintiff was also trafficked, is located.

142. The Hotel Royale Defendant knew or should have known long before Plaintiff's trafficking, that sex trafficking was occurring both on and around its property. Trafficking at the Hotel Royale was open and obvious, with trafficking victims visible on the property and traffickers loitering outside of rooms and in the parking lot.

143. The Hotel Royale is one of the hotels where Plaintiff's trafficker forced her to live, and where Johns responding to online advertisements of Plaintiff would meet her for sex.

144. Plaintiff was trafficked at the Hotel Royale along other minors. Her trafficker housed multiple victims in a single room at the hotel.

145. While at the Hotel Royale, Plaintiff's trafficker forced her to meet a daily revenue quota. She was forced to engage with multiple men per day.

146. When a John arrived for a date with one of the other minors being trafficked alongside Plaintiff, she would sit just outside the room, on the open and unpartitioned second floor of the Hotel Royale, and wait until the John concluded with his victim.

147. The Hotel Royale staff observed Plaintiff coming and going from the hotel lobby several times per day. The staff never offered her assistance and instead continued to rent to her trafficker.

148. Plaintiff herself observed, on more than one occasion, her trafficker interacting, laughing, and conversing with the owner and/or manager of the hotel, indicating that Plaintiff's trafficker had befriended hotel management.

149. More generally, the staff at the Hotel Royale observed a larger stream of men coming, staying for a short period of time, and then leaving the hotel. They came not only for dates with Plaintiff and her trafficker's other victims, but for dates with the victims of other traffickers, also operating out of the Hotel Royale.

150. Plaintiff and the other girls being trafficked from the same room frequently requested additional towels and linens from hotel staff as a result of the volume of men visiting each day. Housekeeping staff would enter the room, and Plaintiff and the other victims would step outside to wait while they cleaned.

151. And because of the immense volume of male visitors, the trash can in Plaintiff's room, when emptied by housekeeping staff, was overflowing with used condoms.

152. During her stays at the Hotel Royale, Plaintiff observed several other sex trafficking victims.

153. The Hotel Royale Defendant knew or should have known that Plaintiff was a trafficking victim, and that it was generating revenue from her exploitation.

154. Several employees at the Hotel Royale observed Plaintiff during her many stays there. The Hotel Royale Defendant is responsible for the acts, omissions, and knowledge of its

employees while they, during the course and scope of their employment, rented hotel rooms to her trafficker, and serviced hotel rooms that evidenced a high volume of commercial sex activity.

155. The Hotel Royale Defendant facilitated the trafficking of Plaintiff and numerous other victims by, among other things:

a. inadequately hiring, training, and supervising its employees;

b. choosing not to report known or suspected criminal activity to law enforcement; and

c. implicitly and/or explicitly encouraging the activity of traffickers, including Plaintiff's trafficker, by creating an environment where trafficking could openly occur without risk of interference or detection by law enforcement.

**COUNT I**
**TVPRA, 18 U.S.C § 1595**
**(Days Inn Defendant and the Wyndham Defendants)**

156. Plaintiff repeats and reincorporates the allegations set forth in paragraphs 1-155 above, as if fully set forth herein.

157. In violation of 18 U.S.C. § 1595(a), the Days Inn Defendant, Avish, and the Wyndham Defendants (Wyndham and Days Inn Corp.), knowingly benefited from participation in a venture that it knew or should have known engaged in sex trafficking in violation of 18 U.S.C. § 1591.

158. The Days Inn Defendant and Wyndham Defendants knowingly participated in a venture that was responsible for operating the Days Inn hotel. This venture, which Plaintiff calls the "Days Inn Venture," included not only the named Defendants, but also their employees, including those who were complicit in and supported, assisted, and/or facilitated sex trafficking at the Days Inn.

159. The Days Inn Venture was engaged in, or its activities affected interstate commerce.

160. The Days Inn Defendant and Wyndham Defendant assumed the risk of operating the Days Inn and Days Inn Venture. Throughout 2023, the Days Inn Defendant and Wyndham Defendants participated in the Days Inn Venture by, among other things, owning, operating, overseeing and controlling the Days Inn.

161. Throughout 2023, the Days Inn Venture included at least one participant who would be criminally liable under the TVPRA, 18 U.S.C. § 1591(a), as a sex trafficking perpetrator. For example, and at a minimum, the complicit hotel employees who accommodated and facilitated the conduct of traffickers and of Johns at the Days Inn could be liable under § 1591 as perpetrators, as well as beneficiaries under the TVPRA.

162. Furthermore, throughout 2023, the Days Inn Defendant was the employer of the staff at the Days Inn hotel, including hotel staff who facilitated trafficking at the Days Inn. Therefore, because the Days Inn Defendant is liable for the acts and/omissions of their employees while in the course and scope of their employment, the Days Inn Defendant directly participated in acts of trafficking in violation of § 1591.

163. At least one participant in the Days Inn Venture facilitated the trafficking of Plaintiff at the Days Inn knowingly, or acting with reckless disregard for the likelihood, that Plaintiff's trafficker(s) were employing means of force, threats of force, fraud, coercion, or some combination thereof to cause Plaintiff's involuntary participation in commercial sex activity.

164. Furthermore, at least one of the participants in the Days Inn Venture had a reasonable opportunity to observe Plaintiff, a minor, while she was being trafficked at the Days Inn.

165. The Days Inn Defendant and Wyndham Defendants knew they were participating in a venture (the Days Inn Venture), and they knew or should have known that the Days Inn Venture violated the TVPRA because the Days Inn Defendant (including its employees, agents, representatives and executives) observed the key signs of sex trafficking exhibited by Plaintiff, her trafficker(s), the rooms in which Plaintiff was trafficked, the frequent traffic of men to Plaintiff's room, and the numerous other victims being trafficked at the hotel, and because the Wyndham Defendants had knowledge of the same through the means of control set forth above.

166. The Days Inn Defendant and Wyndham Defendants knowingly benefited from the Days Inn Venture by receiving profits generated through the operation of the Days Inn hotel, a substantial portion of which derived from the commercial sexual exploitation of minors, including Plaintiff.

167. As a direct and proximate result of the Days Inn and Wyndham Defendants' conduct and participation in the sex trafficking venture occurring at the Days Inn hotel, Plaintiff suffered substantial physical, emotional, and psychological harm, along with other damages to be proven at trial.

168. The Days Inn Defendant and Wyndham Defendants are liable to Plaintiff for her injuries in an amount to be proven at trial, including for reasonable attorneys' fees under the TVPRA and punitive damages.

169. All Defendants are jointly and severally liable for damages arising from the indivisible injuries they individually and collectively caused Plaintiff Jane Doe.

**COUNT II**
**TVPRA, U.S.C. §1595**
**(Palace Inn Defendant and Palace Inn Franchising)**

170. Plaintiff repeats and incorporates the allegations set forth in paragraphs 1-155 above, as if fully set forth herein.

171. In violation of 18 U.S.C. § 1595(a), the Palace Inn Defendant, Vali, and Palace Inn Franchising knowingly benefitted from participation in a venture that they knew or should have known participated in sex trafficking in violation of 18 U.S.C. § 1591.

172. The Palace Inn Defendant and Palace Inn Franchising knowingly participated in a venture that operated the Palace Inn hotel. This venture, which Plaintiff calls the "Palace Inn Venture," included not only the named Defendants, but also their employees, including those who were complicit in and supported, assisted, and/or facilitated sex trafficking at the Days Inn.

173. The Palace Inn Venture was engaged in, or its activities affecting interstate commerce.

174. The Palace Inn Defendant and Palace Inn Franchising assumed the risk of operating the Palace Inn hotel and the Palace Inn Venture. Throughout 2023, the Palace Inn Defendant and Palace Inn Franchising participated in the Palace Inn Venture by, among other things, owning, operating, overseeing, and controlling the Palace Inn hotel.

175. Throughout 2023, the Palace Inn Venture included at least one participant who would be criminally liable under the TVPRA, 18 U.S.C. § 1591(a), as a sex trafficking perpetrator. For example, and at a minimum, the complicit hotel employees who accommodated and facilitated the conduct of traffickers and Johns at the Palace Inn hotel could be liable as perpetrators under § 1591 as well as beneficiaries under the TVPRA.

176. Furthermore, throughout 2023, the Palace Inn Defendant was the employer of the staff at the Palace Inn hotel, including hotel staff who facilitated trafficking at the Days Inn. Therefore, because the Palace Inn Defendant is liable for the acts and/omissions of their employees while in the course and scope of their employment, the Palace Inn Defendant directly participated in acts of trafficking in violation of § 1591.

177. At least one of the participants in the Palace Inn Venture facilitated the trafficking of Plaintiff at the Palace Inn knowingly, or acted with reckless disregard for the likelihood, that Plaintiff's traffickers were employing means of force, threats of force, fraud, coercion, or some combination thereof to cause Plaintiff's involuntary participation in commercial sex activity.

178. Further, at least one of the participants in the Palace Inn Venture had a reasonable opportunity to observe Plaintiff, a minor, while she was being trafficked at the Palace Inn.

179. The Palace Inn Defendant knew it was participating in a venture (the Palace Inn Venture), and it knew or should have known that the Palace Inn Venture violated the TVPRA because the Palace Inn Defendant (including its employees, agents, representatives and executives) observed the key signs of sex trafficking exhibited by Plaintiff, her trafficker(s), the rooms in which Plaintiff was trafficked, the frequent traffic of men to Plaintiff's room, and the numerous other victims being trafficked at the hotel.

180. The Palace Inn Defendant knowingly benefited from the Palace Inn Venture by receiving profits generated through the operation of the Palace Inn hotel, a substantial portion of which derived from the commercial sexual exploitation of minors, including Plaintiff.

181. As a direct and proximate result of the Palace Inn Defendant's conduct and participation in the sex trafficking venture occurring at the Palace Inn hotel, Plaintiff suffered

substantial physical, emotional, and psychological harm, along with other damages to be proven at trial.

182. The Palace Inn Defendant and Palace Inn Franchising are liable to Plaintiff for her injuries in an amount to be proven at trial, including for reasonable attorneys' fees under the TVPRA and punitive damages.

183. All Defendants are jointly and severally liable for damages arising from the indivisible injuries they individually and collectively caused Plaintiff Jane Doe.

**COUNT III**
**TVPRA, 18 U.S.C § 1595**
**(the Camelot Inn Defendant)**

184. Plaintiff repeats and incorporates the allegations set forth in paragraphs 1-155 above, as if fully set forth herein.

185. In violation of 18 U.S.C. § 1595(a), the Camelot Inn Defendant, HD 1960 Corp., knowingly benefitted from participation in a venture that they knew or should have known participated in sex trafficking in violation of 18 U.S.C. § 1591.

186. The Camelot Inn Defendant knowingly participated in a venture that operated the Camelot Inn. This venture, which Plaintiff calls the "Camelot Inn Venture," included not only the Camelot Inn Defendant, but also its employees, including those who were complicit in and supported, assisted, and/or facilitated sex trafficking at the Camelot Inn hotel.

187. The Camelot Inn Venture was engaged in, or its activities affected interstate commerce.

188. The Camelot Inn Defendant assumed the risk of operating the Camelot Inn hotel and the Camelot Inn Venture. Throughout 2023, the Camelot Inn Defendant participated in the

Camelot Inn Venture by, among other things, owning, operating, overseeing, and controlling the Camelot Inn hotel.

189. Throughout 2023, the Camelot Inn Venture included at least one participant who would be criminally liable under the TVPRA, U.S.C. § 1591(a), as a sex trafficking perpetrator. For example, and at a minimum, the complicit hotel employees who accommodated and facilitated the conduct of traffickers and Johns at the Camelot Inn hotel could be liable as perpetrators under § 1591 as well as beneficiaries under the TVPRA.

190. Furthermore, throughout 2023, the Camelot Inn Defendant was the employer of the staff at the Camelot Inn hotel, including hotel staff who facilitated trafficking at the Camelot Inn. Therefore, because the Camelot Inn Defendant is liable for the acts and/omissions of their employees while in the course and scope of their employment, the Camelot Inn Defendant directly participated in acts of trafficking in violation of § 1591.

191. At least one of the participants in the Camelot Inn Venture facilitated the trafficking of Plaintiff at the Camelot Inn knowingly, or acted with reckless disregard for the likelihood, that Plaintiff's traffickers were employing means of force, threats of force, fraud, coercion, or some combination thereof to cause Plaintiff's involuntary participation in commercial sex activity.

192. Further, at least one of the participants in the Camelot Inn Venture had a reasonable opportunity to observe Plaintiff, a minor, while she was being trafficked at the Camelot Inn.

193. The Camelot Inn Defendant knew it was participating in a venture (the Camelot Inn Venture), and it knew or should have known that the Camelot Inn Venture violated the TVPRA because the Camelot Inn Defendant (including its employees, agents, representatives and executives) observed the key signs of sex trafficking exhibited by Plaintiff, her trafficker(s), the

rooms in which Plaintiff was trafficked, the frequent traffic of men to Plaintiff's room, and the numerous other victims being trafficked at the hotel.

194. The Camelot Inn Defendant knowingly benefited from the Camelot Inn Venture by receiving profits generated through the operation of the Camelot Inn hotel, a substantial portion of which derived from the commercial sexual exploitation of minors, including Plaintiff.

195. As a direct and proximate result of the Camelot Inn Defendant's conduct and participation in the sex trafficking venture occurring at the Camelot Inn hotel, Plaintiff suffered substantial physical, emotional, and psychological harm, along with other damages to be proven at trial.

196. The Camelot Inn Defendant is liable to Plaintiff for her injuries in an amount to be proven at trial, including for reasonable attorneys' fees under the TVPRA and punitive damages.

197. All Defendants are jointly and severally liable for damages arising from the indivisible injuries they individually and collectively caused Plaintiff Jane Doe.

**COUNT IV**
**TVPRA, 18 U.S.C. § 1595**
**(Hotel Royale Defendant)**

198. Plaintiff repeats and reincorporates the allegations set forth in paragraphs 1-155 above, as if fully set forth herein.

199. In violation of 18 U.S.C. § 1595(a), the Hotel Royale Defendant, Jai Bhagavan, Inc., knowingly benefited from participation in a venture that it knew or should have known engaged in sex trafficking in violation of 18 U.S.C. § 1591.

200. Hotel Royale Defendant knowingly participated in a venture that was responsible for operating the Days Inn hotel. This venture, which Plaintiff calls the "Hotel Royale Venture,"

included not only the named Defendants, but also their employees, including those who were complicit in and supported, assisted, and/or facilitated sex trafficking at the Hotel Royale.

201. The Hotel Royale Venture was engaged in, or its activities affected interstate commerce.

202. The Hotel Royale Defendant assumed the risk of operating the Hotel Royale and Hotel Royale Venture. Throughout 2023, the Hotel Royale Defendant participated in the Hotel Royale Venture by, among other things, owning, operating, overseeing and controlling the Hotel Royale.

203. Throughout 2023, the Hotel Royale Venture included at least one participant who would be criminally liable under the TVPRA, 18 U.S.C. § 1591(a), as a sex trafficking perpetrator. For example, and at a minimum, the complicit hotel employees who accommodated and facilitated the conduct of traffickers and of Johns at the Hotel Royale could be liable under § 1591 as perpetrators, as well as beneficiaries under the TVPRA.

204. Furthermore, throughout 2023, the Hotel Royale Defendant was the employer of the staff at the Hotel Royale, including hotel staff who facilitated trafficking at the Hotel Royale. Therefore, because the Hotel Royale Defendant is liable for the acts and/omissions of their employees while in the course and scope of their employment, the Hotel Royale Defendant directly participated in acts of trafficking in violation of § 1591.

205. At least one participant in the Hotel Royale Venture facilitated the trafficking of Plaintiff at the Days Inn knowingly, or acting with reckless disregard for the likelihood, that Plaintiff's trafficker(s) were employing means of force, threats of force, fraud, coercion, or some combination thereof to cause Plaintiff's involuntary participation in commercial sex activity.

206. Furthermore, at least one of the participants in the Hotel Royale Venture had a reasonable opportunity to observe Plaintiff, a minor, while she was being trafficked at the Hotel Royale.

207. The Hotel Royale Defendant knew it was participating in a venture (the Hotel Royale Venture), and it knew or should have known that the Hotel Royale Venture violated the TVPRA because the Hotel Royale Defendant (including its employees, agents, representatives and executives) observed the key signs of sex trafficking exhibited by Plaintiff, her trafficker(s), the rooms in which Plaintiff was trafficked, the frequent traffic of men to Plaintiff's room, and the numerous other victims being trafficked at the hotel.

208. The Hotel Royale Defendant knowingly benefited from the Days Inn Venture by receiving profits generated through the operation of the Hotel Royale, a substantial portion of which derived from the commercial sexual exploitation of minors, including Plaintiff.

209. As a direct and proximate result of Hotel Royale Defendant's conduct and participation in the sex trafficking venture occurring at the Hotel Royale, Plaintiff suffered substantial physical, emotional, and psychological harm, along with other damages to be proven at trial.

210. The Hotel Royale Defendant is liable to Plaintiff for her injuries in an amount to be proven at trial, including for reasonable attorneys' fees under the TVPRA and punitive damages.

211. All Defendants are jointly and severally liable for damages arising from the indivisible injuries they individually and collectively caused Plaintiff Jane Doe.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment to be awarded to her and against all Defendants for the following:

a. Process issue as provided by law;

b. Actual damages from Defendants in amounts to be proven at trial;

c. All general, special, compensatory, economic, consequential, punitive, and other allowable damages from Defendants in accordance with the enlightened conscience of an impartial jury;

d. Attorneys' fees;

e. A trial by jury; and

f. Such other relief as this Court may deem proper under the circumstances of this action.

Respectfully submitted,

**J JACKSON LAW OFFICES**

____________________________

Kimberley Evans House
Federal Bar No. 2533920
Texas Bar No. 24081852
Jonathan Jackson
Federal Bar No. 3415655
Texas Bar No. 2402084
6944 Cypress Creek Parkway #200
Houston, TX 77069
Phone: (346) 980-4600
Email: contact@855getjjlaw.com
jjackson@855getjjlaw.com

**STROM LAW FIRM, LLC**
Bakari T. Sellers (PHV Application fortrhcoming)
6923 North Trenholm Road
Columbia, South Carolina 29206
(803) 252-4800
bsellers@stromlaw.com

**HAYNSWORTH SINKLER BOYD, P.A.**
Joseph D. Dickey, Jr. (PHV application forthcoming)

1201 Main Street, 22nd Floor
Columbia, South Carolina 29201
(803) 779-3080
jdickey@hsblawfirm.com

*Attorneys for Plaintiff*

This 22nd day of September 2026